# In the United States Court of Federal Claims

**No. 19-1421C**
**Filed: April 3, 2020**
**Redacted Version Issued for Publication: April 26, 2020[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * * * ** | |
| | * |
| **HARMONIA HOLDINGS GROUP, LLC,** | * |
| | * |
| Protestor, | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| Defendant, | * |
| | * |
| v. | * |
| | * |
| **ALETHIX, LLC,** | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
| * * * * * * * * * * * * * * * ** | |

Post-Award; Bid Protest; Small Business Administration; Exhaustion; Technical Evaluation; Best Value Trade-Off.

**W. Brad English,** Maynard Cooper & Gale, Huntsville, AL, for protestor. With him was **Emily J. Chancey** and **Michael W. Rich**, Maynard Cooper & Gale, Huntsville, AL.

**Bryan M. Byrd**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him was **Zachary J. Sullivan**, Trial Attorney, Commercial Litigation Branch **Patricia M. McCarthy**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division. Of counsel was **Wilmary Bernal** and **James Latoff**, Attorney, United States Department Commerce, and Karen L. Hunter, Attorney, Small Business Administration.

**Jonathan M. Baker,** Crowell & Moring LLP, Washington, DC, for intervenor. With him were **Eric M. Ransom** and **Zachary H. Schroeder**, Crowell & Moring LLP, Washington, DC.

---

[1] This Opinion was issued under seal on April 3, 2020. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

<u>**HORN, J.**</u>

Protestor, Harmonia Holdings Group, LLC (Harmonia), filed a post-award bid protest in the United States Court of Federal Claims challenging the decision of the United States Department of Commerce, Economics and Statistics Administration, United States Census Bureau, Applications Development and Services Division (the Agency) to award a task order to Alethix, LLC (Alethix), the intervenor.

**FINDINGS OF FACT**

On June 3, 2019, the Agency issued a Request for Quotations (RFQ) YA 1323-19-KA-0001.[2] By way of background, the RFQ indicated:

> The U. S. Census Bureau is the primary source of basic statistics about the population and economy of the Nation. These statistics assist the Congress, the executive branch of the Federal Government, state and local governments, the public, and the private sector in the development and evaluation of social and economic activities. The USCB's [United States Census Bureau's] major programs are the periodic censuses, Current Surveys, and a wide range of reimbursable work for other agencies.

The RFQ explained that "[t]o fulfill the critical and continually expanding mission to meet the data requirements of users and to reduce growth in operating costs, the USCB has become increasingly reliant upon Information Technology (IT)," and the IT "resources enable staff to develop, process, and maintain enormous collections of basic data about the people and economy of the Nation. The importance of maintaining a state of the art capability to accomplish the mission of the USCB is imperative." The RFQ continued: "The Applications Development and Services Division (ADSD) of the USCB has primary responsibility for establishing and maintaining the USCB's capability to conduct field survey and data collection operations for multiple programs, including the decennial census, economic surveys, American Community Survey (ACS), and current surveys programs." The RFQ noted "[a]s the USCB's principle provider of system solutions for automating mission-critical survey/data field data collection and related activities, the ADSD [Applications Development and Services Division] is responsible for investment in the portfolio of systems and applications that support survey and data collection operations."

The RFQ stated that the Applications Development and Services Division "specializes in the design, development, implementation, and support of data warehousing systems used to gather and report on paradata and response data coming from the data capture case management and cost systems," and that "[t]he Unified

---

[2] On June 12, 2019, the Agency subsequently issued Amendment #A001 to the RFQ. The court refers to the language of the Amendment #A001 in describing the requirements of the RFQ.

Tracking System Development Branch (UTSDB) is responsible for the business analysis, IT systems design, development, and support for the Enterprise Reporting System." The RFQ continued: "The Enterprise Reporting System serves as a data warehouse system that provides a view of survey data over time, across surveys, and from different data capture and cost sources at one time; all of the data is in one place to view, analyze, and make more efficient and effective decisions." Regarding the Enterprise Reporting System, the RFQ explained:

> The Enterprise Reporting System has two major components: currents surveys and economic surveys. The Enterprise Reporting System for current surveys is the cost, progress, and quality data warehouse/reporting system for all surveys and their field data collection operations. The Enterprise Reporting System for economic surveys tracks the daily check-in data against progress goals and serves as the internet paradata repository.

The RFQ explained

> [t]he purpose of this task order is to procure contractor services to provide SAS programming and database programming support for the Enterprise Reporting System project inside of ADSD. The Enterprise Reporting System supports Demographic and Economic surveys with cost, progress & quality reports as part of our broader mission to enable Adaptive Design and providing Business Intelligence Tools. This work will support services to aid in the design, build and maintenance of the Enterprise Reporting System. Contractor support services will include system development support, high-level and detailed system/application design support. System development support will include, but is not limited to, the following: authoring software to ingest data, aggregate data, generate reports, create emails and other activities on a daily basis.

The RFQ made clear "[t]his is a notice that this order is a total set aside for women-owned small businesses. Only quotes submitted by women-owned small businesses will be accepted by the Government. Any quote that is submitted by a contractor that is not a women-owned small business will not be considered for award."[3] The Formal Acquisition Plan for Enterprise Reporting System Support Solicitation #YA1323-19-KD-0001 explained, by way of background:

> Enterprise Reporting System Support, Decennial Reporting System Support, and Decennial Census Data Lake (CDL) support is currently being

---

[3] The award decision memo reflects that after market research, the Agency identified four woman-owned small businesses the Agency believed were capable of performing the task order: Protestor Harmonia, [redacted] and [redacted]. Subsequently, [redacted] contacted the contract specialist that it was no "longer be eligible to participate in the competition of this acquisition." In addition, on June 6, 2019, intervenor Alethix express interest in "participating in this procurement," and the Agency sent the RFQ to Alethix.

provided by Accenture Federal Services under one task order - #YA1323-14-NC-0112. The original task order was set-aside for small businesses on the NIH CIO-SP3 Small Business Government-Wide Acquisition Contract (GWAC). Agilex Technologies was awarded the original task order. During contract performance, Agilex Technologies was acquired by Accenture Federal Services. The task order was officially novated through a formal modification on October 12, 2016. The current period of performance is due to expire September 30, 2019.

In the RFQ, the Agency stated that it "intends to issue a Time and Materials task order under the General Service Administration's (GSA) IT Schedule 70 awarded to a small business for a 12-month base period and six (6) additional twelve (12) month option periods." Regarding the period of performance, the RFQ indicated:

The seven (7) year life cycle includes a one-year base period plus six (6) one-year option periods as follows:

Base Period:            July 1, 2019 – June 30, 2020
Option Period 1:        July 1, 2020 – June 30, 2021
Option Period 2:        July 1, 2021 – June 30, 2022
Option Period 3:        July 1, 2022 – June 30, 2023
Option Period 4:        July 1, 2023 – June 30, 2024
Option Period 5:        July 1, 2024 – June 30, 2025
Option Period 6:        July 1, 2025 – June 30, 2026

The RFQ noted that, pursuant to FAR 52.217-8,[4] the period of performance, could be extended from July 1, 2026 to December 31, 2026.

For the evaluation of the offerors' proposals, the RFQ indicated that:

The proposals will be evaluated against the Government's following five (5) factors:

---

[4] FAR 52.217-8, "Option To Extend Services," states:

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within ___ [insert the period of time within which the Contracting Officer may exercise the option].

48 C.F.R § 52.217-8 (2019). The RFQ provided the contracting officer three days within the contract end date to exercise the option.

4

**Factor 1** – Technical
**Factor 2** – Key Personnel
**Factor 3** – Management
**Factor 4** – Similar Experience and Past Performance
**Factor 5** – Price

(emphasis in original). The RFQ explained that the "[f]actors one through four are referred to as the Technical Factors. Factor five is a Price Factor that will be evaluated separately and applied in the determination of best value. The rated technical evaluation criteria are significantly more important than price."

Regarding the first factor, Technical, the RFQ indicated that an offeror's technical approach would be evaluated to determine the extent to which it meets the requirements in performance work statement. Additionally, the RFQ stated "[t]he Government's evaluation of the Offeror's technical approach will also include an assessment of the Contractor's capability and innovation of the approach, methods, and procedures for completing the tasks," and "[a]ll information will be evaluated to determine the degree it demonstrates the likelihood that the Offeror will successfully complete the requirements." For the Key Personnel factor, the RFQ stated that: "Key Personnel will be evaluated on the qualifications, experience, knowledge and adequacy of the proposed key personnel deemed necessary to satisfy the solicitation's requirements. The Government will evaluate the background, professional credentials, and relevant experience of key personnel in performing the required tasks." The RFQ also noted:

> The information presented in the Offeror's proposal together with information from any other sources available to the Government will provide the primary input for evaluation of this factor. The Government's evaluation of the Offeror's proposal will consider the strengths, weaknesses and risks associated with each of the key personnel as well as the entire team of key personnel.

For the Management factor, the offeror's proposal was to be "evaluated to determine the extent to which the Offeror has developed an effective and efficient Contract Management Plan," and to "successfully manage and fulfill the requirements of the Performance Work Statement. The Government's evaluation of Factor 3: Management will consider the strengths, weaknesses and risks of the Offeror's management approach." For the Similar Experience and Past Performance factor, the RFQ provided that "[e]valuation of past performance will allow the Government to determine whether the Offeror consistently delivered quality services in a timely manner. Past performance will be evaluated for contracts performed by the Offeror during the last three (3) years consistent with the size, scope and complexity of this solicitation."

For the Price factor, the RFQ noted, "[t]he price evaluation will be based on price reasonableness, total evaluated price, and a comparison with independent government cost estimate, if available," and "[t]he price evaluation will include price completeness and accuracy, price reasonableness, and total evaluated price." In addition, "[r]easonableness

determinations will be made by determining if competition exists, by comparing bid labor rate price with established General Services Administration price schedules, and by comparing total bid prices with the Independent Government Cost Estimate (IGCE)."

The RFQ explained that award would be made after a best value determination, noting that:

> The USCB's evaluation will be based on best value principles. Accordingly, an award will be made to the responsible and technically acceptable Offeror whose proposal provides the greatest overall value to the Government, price and other factors considered. This best value determination will be accomplished by comparing the value of the differences in the technical factors for competing offers, based on their strengths, weaknesses, and risks, with differences in their price to the Government. In making this comparison, the Government is more concerned with obtaining superior technical and management capabilities than with making an award at the lowest overall cost to the Government. However, the Government will not make an award at a higher overall price to the Government to achieve slightly superior technical skills.

Three offerors submitted timely proposals: protestor Harmonia, intervenor Alethix, and [redacted]. On September 3, 2019, the Technical Evaluation Team issued the Final Conesus Technical Report. The Final Conesus Technical Report explained

> [f]rom June 24, 2019 through July 1, 2019, the individual TET [Technical Evaluation Team] members reviewed the offerors' proposals independently. An evaluation template was provided to the TET as a guideline and they were instructed to keep all notes. The individual TET members evaluated the written technical proposals in accordance with Section M – Evaluation Factors for Award of the solicitation. The TET members reviewed and documented their independent assessments of the vendors' responses for each factor. Each TET member independently evaluated the strengths, weaknesses and risks of each of the offerors' proposals.
>
> The TET then came together throughout the period of July 2, 2019 through July 9, 2019 for multiple consensus meetings. . . . The team recorded the group's consensus findings for strengths, weaknesses and risks for the offerors' proposals for each factor. The consensus findings documented in this report served as the input to the Trade-Offs/Best Value Recommendation conducted with the Price Evaluation Team.

The Final Conesus Technical Report continued: "After thoroughly reviewing the technical proposals for each offeror and evaluating them against the criteria in Section M of the solicitation, the TET reached a consensus on the technical ranking." The Technical Evaluation Team ranked the offerors in the following order:

1. Alethix
2. Harmonia
3. [redacted]

For Factor 1, the Technical factor, Alethix's technical proposal received 9 strengths, 1 weakness and 2 risks. For Factor 2, the Key Personnel factor, Alethix's technical proposal received 2 strengths, 0 weakness and 0 risks. For the Management factor, Factor 3, Alethix's technical proposal received 11 strengths, 0 weakness and 2 risks, and for the Similar Experience and Past Performance factor, Factor 4, Alethix received 1 strength, 0 weakness and 0 risks. The Technical Evaluation Team's narrative summary noted that

> The TET ranked Alethix #1 for their technical proposal. The Offeror provided a thorough technical proposal that demonstrated significant strengths presenting numerous benefits to the Government. Alethix's technical proposal had no notable or significant weaknesses or risks. The offeror's technical approach demonstrated Alethix's capability to successfully perform the requirements as well as provide innovative approaches, methods, and procedures for completing the tasks. Alethix's experience with the work and systems being used by Enterprise Reporting directly correlate to the work required in Section C and increase the likelihood of successfully meeting the requirements. In addition, Alethix proposed [redacted] and utilizing [redacted].

The narrative summary for Factor 1 stated "the offeror proposed utilizing cutting edge, next generation technologies [redacted] which could improve quality, and increase efficiencies/team performance." The narrative summary also noted:

> The offeror proposes a strong subcontracting partnership [redacted]. This greatly minimizes the impact of transition and maintains knowledge of Enterprise Reporting System. Although risks/weaknesses were identified, there were no weaknesses or risks found for Factor 1 that influenced the evaluation team's ranking which would create a work stoppage in the development or a mismanagement in Census operations.

The Award Decision Memorandum summarized the Technical Evaluation Team's analysis of Alethix's technical proposal:

> The TET ranked Alethix's technical proposal the highest, #1. The Offeror provided a thorough technical proposal that demonstrated significant strengths presenting numerous benefits to the Government. Alethix's technical proposal had no notable or significant weakness or risks. The offeror's technical approach demonstrated Alethix's capability to successfully perform the requirements as well as provide innovative approaches, methods, and procedures for completing the tasks. Alethix's experience with the work and systems being used by Enterprise Reporting directly correlate to the work required in Section C and increase the

likelihood of successfully meeting the requirements. In addition, Alethix proposed [redacted].

As noted above, the Technical Evaluation Team ranked Harmonia second, and determined that for the Technical factor, Factor 1, Harmonia's technical proposal received 9 strengths, 0 weakness and 2 risks, and for Factor 2, the Key Personnel factor, Harmonia's technical proposal received 1 strength, 0 weakness and 0 risks. For the Management factor, Factor 3, Harmonia's technical proposal received 4 strengths, 0 weakness and 2 risks, and for the Similar Experience and Past Performance factor, Factor 4, Harmonia received 2 strength, 0 weakness and 0 risks.

The Technical Evaluation Team's narrative summary for Harmonia noted: "The TET ranked Harmonia #2 for their technical proposal. The offeror had a strong technical approach with a few innovative ideas utilizing new technologies and received outstanding ratings for two of the past performances provided." The narrative summary for Factor 1 stated:

> For Factor 1, the offeror proposed utilizing cutting edge, next generation technologies such as introducing a [redacted] into the ERS [Enterprise Reporting System] architecture and utilizing [redacted]. These technologies could improve system performance and create efficiencies while improving team performance. The offeror also proposed utilizing [redacted], which would give USCB greater visibility into the resource utilization of the entire team. The offeror proposed training the [redacted]. This would lead to standardized processes for gathering requirements and improving quality. Although weaknesses/risks were identified, they were considered easily mitigated and would not create a work stoppage in development or a mismanagement of Census Operations.

The Technical Evaluation Team identified nine strengthens for Factor 1 for Harmonia, as follows:

**Strengths:**

1. **Technical approach – RFP C.3.1/Proposal Page 2-1, Section 2.1.** The offeror's proposal demonstrates vast experience in implementing agile methodologies. This is significant because this would benefit the Government in improving development and project management processes.

2. **Technical approach – RFP C.3.6.2.7/Proposal Page 2-1, Section 2.A3.** The offeror's proposal shows they are ISO 9001:2015 and CMMI Level 3 certified. This is significant because it would ensure quality output in all aspects of contract performance.

3. **Technical approach – RFP C.3.6.2.7/Proposal Page 2-1, Section 2.A4.** The offeror proposes a Quality and Processes team to audit each project quarterly to ensure compliance with the ISO and CMMI requirements. This is significant because it would result in better quality assurance for the government.

4. **Technical approach – RFP C.3.1/Proposal Page 2-3, Section 2.1.** The offeror proposes implementation of [redacted], which introduces a cohesive approach to managing both development and operations and maintenance support activities across the team. This is significant because this would provide a level of transparency and accountability that would allow the Government to more effectively manage resources across the team. This creates transparency in the development process, improving ADSD's [Applications Development and Services Division's] relationship with customers.

5. **Technical approach – RFP C.3.1/Proposal Page 2-6, Section 2.2.1.** The offeror proposed the use of code templates. This is significant because this would benefit the Government by creating more efficient development and troubleshooting processes.

6. **Technical approach – RFP C.3.1/Proposal Page 2-6, Section 2.2.1.** The offeror proposes cross-training of development staff. This is significant because this would eliminate single points of failure/dependencies on individuals and make the overall team (Government and Contractor) more efficient in responding to inquiries and issues.

7. **Technical approach – RFP C.3.1/Proposal Page 2-7, Section 2.2.1.** The offeror proposes the introduction of a [redacted] into the Enterprise Reporting System architecture. This is significant because this would introduce a new technology stack capable of handling large volumes of data and introduce new capabilities such as:
- Dealing with structured, semi-structured, and unstructured data
- Performing advanced analytics
- Data discovery
- Integration of machine learning logic
- Providing increased access for data users across the agency

8. **Technical approach – RFP C.3.1/Proposal Page 2-8, Section 2.2.1.** The offeror proposes the introduction of [redacted]. This is significant because this would create efficiencies in the development cycle that will save time and, potentially, money allowing developers to be more efficient.

9. **Technical approach – RFP C.3.2/Proposal Page 2-9, Section 2.2.2.** The offeror proposes training all business analysts in the [redacted]. This is

significant because this would create consistent requirements gathering, improving software quality.

(emphasis in original).

The Technical Evaluation Team indicated there were no weaknesses for Factor 1 for Harmonia's proposal, and with regards to the risks for Factor 1, the Technical Evaluation Team stated:

**Risks:**

1. **Technical approach – RFP C.3.1/Proposal Page 2-6, Section 2.2.1.** The offeror proposes cross-training of development staff and peer testing of other developer's code. Cross-training of staff or peer testing could cause delays in delivery of software. This is considered a low risk since ADSD [Applications Development and Services Division] monitors contractor performance and tasking to maintain cost controls.

2. **Technical approach – RFP C.3.1/Proposal Page 2-8, Section 2.2.1.** The offeror proposes the introduction of [redacted]. However, as of now, it is unclear if [redacted] is compatible with existing USCB [United States Census Bureau] systems, it could create significant integration issues leading to an increase of costs, lost development time, and schedule delays. This is considered a moderate risk since this could introduce a level of complexity to our environment making issues harder to troubleshoot and software tools harder to integrate.

(emphasis in original).

The Award Decision Memorandum summarized the Technical Evaluation Team's analysis of Harmonia's technical proposal: "The offeror had a strong technical approach with a few innovative ideas utilizing new technologies and received outstanding ratings for two of the past performances provided."[5]

---

[5] The Award Decision Memorandum also summarized Technical Evaluation Team's analysis of [redacted] technical proposal, noting, "[t]he offeror presented a technical approach which provides experience with [redacted] and received outstanding ratings for two of the past performances provided." As noted above, the Technical Evaluation Team ranked [redacted] third, and determined that for the Technical factor, Factor 1, [redacted] technical proposal received 5 strengths, 1 weakness and 2 risks, and for Factor 2, the Key Personnel factor, [redacted] technical proposal received 1 strength, 0 weakness and 0 risks. For the Management factor, Factor 3, [redacted] technical proposal received 6 strengths, 0 weakness and 1 risk, and for the Similar Experience and Past Performance factor, Factor 4, [redacted] received 2 strengths, 1 weakness, and 0 risks. The Technical Evaluation Team's narrative summary for [redacted] stated: "The TET ranked [redacted] #3 for their technical proposal. The offeror presented a technical approach which provides

The Agency also conducted a Price Evaluation and the Price Evaluation Team indicated:

The price evaluation team concluded the following price ranking (1 being the lowest in price, 3 being the highest in price).

### RANKING TOTAL PRICE FOR TASK ORDER

| Offeror Name | Ranking (Low to High) | Price |
|---|---|---|
| [redacted] | 1 | $[redacted] |
| Harmonia Holdings | 2 | $37,168,903.23 |
| Alethix | 3 | $38,216,255.80 |

The Price Evaluation also provided:

**Price Completeness and Accuracy** - All Offerors were determined to have submitted complete and accurate price proposals in accordance with Section L of the solicitation. A price proposal submitted in accordance with the instructions specified in Section L of the solicitation demonstrated that each Offeror understood the price proposal instructions and properly completed the rate schedules, or price proposal worksheets, as found in solicitation Attachment J.4 Price Proposal Worksheet. All proposals applied arithmetic formulas correctly and were appropriately formatted. All Offerors completed the Attached J.4 price proposal worksheet, used the governments estimated amount of hours for each contract role and mapped all contract role to the each Offerors GSA IT 70 Schedule labor categories. All proposals were found to be complete and accurate.

(emphasis in original). The Price Evaluation Team also conducted a price reasonableness analysis, and stated that:

**Price Reasonableness** - Reasonableness determinations were made by determining if competition exists, by comparing bid labor rate price with established General Services Administration price schedules, and by comparing total bid prices with the Independent Government Cost Estimate (IGCE). The Price team had the following findings regarding price reasonableness:

• Per FAR Part 8.405-1(d)(3)(ii), for proposed orders exceeding the simplified acquisition threshold, the ordering activity contracting officer shall provide the solicitation to as many schedule contractors as practicable, consistent with market

experience with [redacted] and received outstanding ratings for two of the past performances provided."

research appropriate to the circumstances, to reasonably ensure that quotes will be received from at least three contractors that can fulfill the requirements. This task order solicitation was competed in accordance with the market research report findings amongst women-owned small businesses under GSA IT Schedule 70 contract holders. In accordance with FAR Part 8.405-1(d)(3)(ii), the solicitation was released to a total of five (5) vendors. In response to the solicitation a total of three (3) vendors provided proposals. As of the proposal submission due date, Alethix, [redacted], and Harmonia Holdings submitted proposals in response to YA1323-19-KD-0001. Therefore, it is concluded that reasonable competition in response to this solicitation exists.

- 

(emphasis in original).

The Price Evaluation Team next examined the prices for price reasonableness. The Price Evaluation Team stated: "In determination of price reasonableness, a comparison was made between the IGCE and each of the Offeror's proposed prices." The Price Evaluation Team concluded:

| Total Proposed Price | | | |
|---|---|---|---|
| Vendor | Total Proposed Price | Lower/Higher than IGCE | Amount Difference from IGCE |
| [redacted] | $[redacted] | [redacted] | $[redacted] |
| **Harmonia** | $ 37,168,903.23 | [redacted] | $[redacted] |
| **Alethix** | $ 38,216,255.80 | [redacted] | $[redacted] |
| **IGCE** | $ [redacted] | | |

The Price Evaluation Team determined that all three offeror's price proposals were lower than the IGCE, and indicated:

[redacted] proposed the lowest total estimated price which was [redacted] below the IGCE. Harmonia proposed the second lowest price which was [redacted] below the IGCE. Alethix proposed the highest price which was [redacted] below the IGCE. Even though the overall prices proposed by each offeror are below the IGCE, all vendors proposed the same level of effort per the instructions in the solicitation. The difference in price is the result of competition which drove vendors to provide significant discounts in rates and the difference in alignment of the GSA Schedule 70 LCATS[6] to the Government's Task Order Labor Categories. The evaluation team found that the GSA IT Schedule 70 LCATS proposed appropriately mapped to the Government's task order roles for each vendor. Based on the price team's findings, the prices proposed by the Offeror's are reasonable for the work to be performed.

---

[6] "LCAT" appears to refer to labor categories.

In summary, the Price Evaluation Team reiterated that the price rankings were: 1) [redacted], 2) Harmonia, and 3) Alethix, and noted that:

> The above analysis and findings support a determination that in the case of all of the Offerors. All of the proposals received in response to this solicitation were reasonable in price. Based on the individual analysis of the Offerors' proposals, it was determined that the Offerors' proposals included labor rates that were fair and reasonable. This determination is based on the fact that three (3) proposals were received in response to the solicitation therefore establishing competition, and the Offerors proposed fully burdened hourly rates that, for a majority of offerors, included discounts off posted GSA IT Schedule contract rates. Furthermore, the General Services Administration (GSA) concluded that posted contract rates were fair and reasonable upon Schedule 70 contract award.

Subsequently, the lead from the Technical Evaluation Team and the lead from the Price Evaluation Team conducted a Best Value Recommendation and Trade-Off Analysis. After summarizing the technical evaluation and the price evaluation, the Best Value Recommendation and Trade-Off Analysis determined:

> Alethix provided a thorough technical proposal that demonstrated significant strengths presenting numerous benefits to the Government. Alethix's technical proposal had no notable or significant weaknesses or risks. Alethix's technical approach demonstrated their capability to successfully perform the requirements and introduces innovative approaches, methods, and procedures that would benefit programs across the USCB [United States Census Bureau] for years to come.

The Best Value Recommendation and Trade-Off Analysis noted that "[o]verall, Alethix proposed utilizing cutting edge, next generation technologies, developing [redacted] that could not only create efficiencies in our team performance, but improve quality and reduce costs for operations across the enterprise."

The Best Value Recommendation and Trade-Off Analysis discussed the other two offerors as well, in comparison to Alethix:

> [redacted] and Harmonia Holdings Group's proposals presented a few notable strengths. [redacted] proposal included utilizing [redacted]. Harmonia Holdings Group, LLC's proposal included introducing a [redacted] into the ERS [Enterprise Reporting System] architecture and utilizing [redacted]. Harmonia's significant strengths provides USCB with a new technology offering new capabilities, as well as development cycle efficiencies. Alethix presented significant strengths that go beyond the approaches and present greater benefits to the USCB than the technical strengths submitted by [redacted] and Harmonia Holdings Group,

[redacted]. Alethix offers knowledge of the current Enterprise Reporting System, as well as numerous USCB programs. Experience with the current Enterprise Reporting System is a significant asset to the successful completion to the task order requirements. Additionally, Alethix proposed the utilization of [redacted], which can provide efficiencies in new report building, software system design, requirement analysis, code migration, and failure identification. Furthermore, Alethix has the ability to significantly reduce the transition-in period due to [redacted]. Overall, Alethix proposed numerous innovations to improve efficiencies and successfully meet the requirements. [redacted] and Harmonia Holdings Group are unable to match these significant strengths and correlating benefits to the USCB. Thus, Alethix's proposal justifies the increased price of $[redacted] over [redacted] proposal and the increased price of $1,047,352.57 over Harmonia Holdings Group's proposal.

The Best Value Recommendation and Trade-Off Analysis determined:

Alethix's price proposal was the third lowest at $38,216,255.80. This proposed price is [redacted] lower than the IGCE at $[redacted]. In comparison to the IGCE, this provides the Government a cost savings of $[redacted] over the life of the task order [sic] When considering the comparative strengths and risks of Alethix's proposal, as well as the strengths, weaknesses and risks of Harmonia Holdings Group and [redacted] offers the best value to the Government even though Alethix's overall price is $1,047,352.57 higher than Harmonia Holdings Group and $[redacted] higher than [redacted]. Despite the total overall price in comparison to other vendor's proposal, Alethix's proposed price is $[redacted] less than the Government's estimate. The Technical proposal presented by Alethix warrants the higher overall task order price as outlined above.

Finally, the Best Value Recommendation and Trade-Off Analysis concluded:

Alethix's technical proposal, based on the narrative in the TET consensus report, as well as Section 6 - Trade-Off Analysis and Section 7 - Best Value Recommendation, was technically superior to the proposals submitted by other Offerors and had the highest price of $38,216,255.80 for the base and option periods. Comparing the relative strengths, weaknesses, and risks as documented in the TET consensus report, Alethix's proposal possessed the highest quality strengths in the technical proposal, without any notable or significant weaknesses and risks. In conclusion, Alethix's proposal provides the Best Value to the Government. With price and other factors considered, it is the PET [Price Evaluation Team] and TET's recommendation that Alethix's proposal is the best value for the Government in comparison to all the other Offerors. Alethix is recommended for award at a total estimated price of $38,216,255.80 for the base and option periods. Alethix proposed

a technically superior approach to meeting task order requirements that will
provide innovation and price benefit to the Government.

On September 5, 2019, the contracting officer issued an Award Decision
Memorandum.[7] The twenty page Award Decision Memorandum recounted the purpose
of the RFQ, the background on the Agency, the market history, procurement history, the
type and length of the task order to be awarded, the evaluations, both technical and price
for all three offerors, and the best value trade off analysis. The Award Decision
Memorandum indicated:

A draft Trade-Offs/Best Value Recommendation report was prepared on
July 16, 2019 which included the technical and price trade-offs that should
be considered in the best value decision. The TET and PET reconvened
following legal review/input on August 14, 2019 through August 16, 2019.
The TET and the PET took into consideration the information gathered and
the consensus was that the best value to the Government would be
achieved by awarding to Alethix, LLC at a total task order value of
$38.216,255.80. In conjunction with his own independent judgemnet [sic],
the Contracting Officer, Dijon Ferdinand, took into consideration the Best
Value Recommendation presented by the TET and PET in his award
determination outlined below.

The Award Decision Memorandum, in the section titled: "Award Determination,"
concluded:

Alethix's technical proposal, based on the narrative in the TET consensus
report, as well as Section 6 - Trade-Off Analysis , and Section 7 - Best Value
Recommendation of the Best Value Recommendation document, was
technically superior to the proposals submitted by other Offerors.
Comparing the relative strengths, weaknesses, and risks as documented in
the TET consensus report, Alethix's proposal possessed the highest quality
strengths in the technical proposal, without any notable or significant
weaknesses and risks. In conclusion, Alethix's proposal provides the Best
Value to the Government. With price and other factors considered, it is the
Contracting Officer's determination, Dijon Ferdinand, [sic] that Alethix's
proposal is the best value for the Government in comparison to all the other
Offerors. The Contracting Officer, Dijon Ferdinand, has determined award
to Alethix, LLC at a total estimated price of $38,216,255.80 for the base and
option periods is in the best interest to the Government. Alethix proposed a
technically superior approach to meeting task order requirements that will
provide innovation and price benefit to the Government.

On September 5, 2019, the Agency informed Harmonia and [redacted] by email
they would not receive the award. Subsequently, on September 6, 2019, award was made

---

[7] The Award Decision Memorandum was prepared by the contract specialist and
approved by the contracting officer.

to Alethix. On September 10, 2019, the Agency provided a written explanation by email for why Harmonia's proposal was not selected. The explanation attached to the email stated, in part, with language similar to the Technical Evaluation Team's analysis :

> There were some weaknesses/risks identified in the proposal, however, those risks could potentially be mitigated in order to prevent any work stoppage in development or a mismanagement of Census Operations. Examples of those risks were as follows:
>
> **Technical approach – RFP C.3.1/Proposal Page 2-6, Section 2.2.1.** Harmonia Holding Group, LLC, proposes cross-training of development staff and peer testing of other developer's code. Cross-training of staff or peer testing could cause delays in delivery of software. This is considered a low risk since ADSD monitors contractor performance and tasking to maintain cost controls.
>
> **Technical approach – RFP C.3.1/Proposal Page 2-8, Section 2.2.1.** Harmonia Holding Group, LLC, proposes the introduction of [redacted]. However, as of now, it is unclear if [redacted] is compatible with existing USCB systems, it could create significant integration issues leading to an increase of costs, lost development time, and schedule delays. This is considered a moderate risk since this could introduce a level of complexity to our environment making issues harder to troubleshoot and software tools harder to integrate.

(emphasis in original).

Thereafter, protestor filed its bid protest in this court. Protestor's amended complaint[8] sets forth three counts, which relate to specific evaluations made by the Agency which protestor argues were "arbitrary and irrational." Count 1 focuses on the two weaknesses identified by the September 10, 2019 Agency letter and asserts that "[t]he Agency assigned Harmonia a risk for proposing that it would cross-train its staff and peer-test other developers' code," and argues that "[c]ross-training gives Harmonia a nimble staff and assures that work continues with fewer failure points in surge situations, turnover situations, and during employee leave," and "[f]ar from creating a risk of delay, this practice saves development and patch cycles by catching bugs before release. Yet the Agency claimed that cross-training presented a risk of delay." Protestor also noted that the Agency assigned Harmonia a risk for its inclusion of [redacted], and "[e]ven though Harmonia tentatively proposed the use of **an** [redacted] was an optional aspect of that proposal. It was arbitrary and capricious to assign a risk based on an optional proposal element." (emphasis in original). The protestor notes "the Agency also assigned

---

[8] At the initial hearing, the court instructed protestor to file corrected version of the complaint in compliance with the court's Rules. Protestor subsequently filed a corrected complaint. Subsequently, protestor filed an amended complaint. Unless otherwise indicated, the court refers to protestor's amended complaint in this Opinion.

Harmonia's proposal strengths **in the very same factor** for the use of cross-training and [redacted]," and "[t]his inconsistency is the epitome of arbitrary and irrational evaluation."

In Count 2 of the amended complaint, protestor argues that "[t]he Agency's failure to recognize the ostensible subcontractor issue apparent on the face of Alethix's proposal and refer Alethix to the SBA [Small Business Administration] for a Status Determination was irrational and contrary to regulation." Protestor argued that Alethix's subcontractor, [redacted], "was other than small for purposes of this acquisition," and "Alethix's proposal made it apparent on its face that [redacted] was only an ostensible subcontractor, rendering it an affiliate of Alethix and Alethix other than small."

Count 3 of protestor's amended complaint alleges that "[t]he Solicitation stated that the Agency would not choose a higher-priced offeror's proposal unless it presented material technical advantages over other proposals. What it did was worse." Protestor claims that "[i]f Factor 1 was the determining factor, then Harmonia should have won award, particularly as it proposed a lower price than Alethix. The Agency acted irrationally when it made award to a lower-rated, more-expensive offeror contrary to the Solicitation's terms." Protestor continues: "The source selection authority's independent review should have recognized the ostensible subcontractor issue in Alethix's proposals, and required the contracting officer to refer Alethix to the SBA. It was unreasonable for the source selection authority not to do so," and, moreover, "the source selection authority's independent review should have revealed the irrational risks assigned to Harmonia's proposal under Factor 1, which almost certainly would have tipped the award to Harmonia." Protestor contends, therefore, the award decision was irrational.

After the filing of the amended complaint, the parties filed cross-motions for judgment on the Administrative Record, and the defendant and intervenor filed motions to dismiss protestor's claim that the Agency was obligated to refer Alethix to the Small Business Administration (SBA) for a Status Determination. Intervenor claims that "[t]his court does not possess jurisdiction to make an initial size determination, which is exactly what Harmonia requests," and defendant argues that the court should "dismiss this size protest filed by plaintiff, Harmonia Holdings Group, LLC (Harmonia), because Harmonia challenges the size of the awardee and Harmonia did not exhaust its administrative remedies." Regarding Counts 1 and 3 of protestor's amended complaint, defendant argues "[t]he court should reject Harmonia's challenge to the assignment of two risks to its technical proposal," and "Harmonia's challenge to the best-value determination lacks merit." Similarly, intervenor argues "[t]he Agency reasonably evaluated Harmonia's proposal," and that "[t]he Agency conducted a proper best-value determination."

## DISCUSSION

Before addressing Count 1 and Count 3 which the parties have filed cross-motions for judgment on the Administrative Record, the court first turns to Count 2, and considers defendant's motion and intervenor's motion to dismiss for failure to exhaust administrative remedies. In protestor's motion for judgment on the Administrative Record, protestor argues that "Alethix's proposal should have put the contracting officer on notice that

[redacted] was an ostensible subcontractor, triggering his duty to refer the matter to the Small Business Administration." Defendant contends that Harmonia's size protest "must be dismissed because Harmonia failed to exhaust its administrative remedies." Similarly, intervenor argues that "Harmonia's protest challenging the Agency's failure to refer Alethix to the SBA for a size determination should be dismissed," because protestor did not follow the administrative procedures for a size protest at the SBA.

"The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decision making." McCarthy v. Madigan, 503 U.S. 140, 144 (1992), superseded by statute as recognized in Woodford v. Ngo, 548 U.S. 81 (2006). The Supreme Court has held "'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'" McKart v. United States, 395 U.S. 185, 194 (1969) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938)); see also Woodford v. Ngo, 548 U.S. 81, 88 (2006); Sandvik Steel Co. v. United States, 164 F.3d 596, 599 (Fed. Cir. 1998) (The general rule is that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted."); Burlington N. R.R. Co. v. United States, 752 F.2d 627, 629 (Fed. Cir. 1985).

"Exhaustion of administrative remedies serves two main purposes." Woodford v. Ngo, 548 U.S. at 89; see also In re DBC, 545 F.3d 1373, 1378 (Fed. Cir. 2008). As described by the United States Supreme Court, the first, and primary, purpose is the development of a proper factual background:

> A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.

McKart v. United States, 395 U.S. at 193–94; see also Kappos v. Hyatt, 132 S. Ct. 1690, 1692 (2012) (noting that "'the avoidance of premature interruption of the administrative process'" is the "primary purpose" of the doctrine of administrative exhaustion). The United States Supreme Court has described this purpose of the exhaustion doctrine "recognizes the notion, grounded in deference to Congress' delegation of authority to coordinate branches of Government, that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." McCarthy v. Madigan, 503 U.S. at 145. Under this theory, "[t]he administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction." McKart v. United States, 395 U.S. at 194. "Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs

it administers before it is hauled into federal court,' and it discourages 'disregard of [the agency's] procedures.'" Woodford v. Ngo, 548 U.S. at 89 (quoting McKart v. United States, 395 U.S. at 195) (alteration in original); Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1254 (Fed. Cir. 2015); In re DBC, 545 F.3d at 1378; see also Kentucky v. United States, 62 Fed. Cl. 445, 453 (2004) ("'When administrative remedies have not been exhausted, "judicial review of administrative action is inappropriate," since it is "a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."'" (quoting Sandvik Steel Co. v. United States, 164 F.3d at 599 (quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988))), aff'd, 424 F.3d 1222 (Fed. Cir. 2005); see also McCarthy v. Madigan, 503 U.S. at 145 ("Correlatively, exhaustion principles apply with special force when 'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures." (quoting McKart v. United States, 395 U.S. at 195)).

The second purpose for requiring exhaustion of administrative remedies is judicial economy. "And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages." McKart v. United States, 395 U.S. at 194; see also Palladian Partners, Inc. v. United States, 783 F.3d at 1254-55. "Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court. In some cases, claims are settled at the administrative level, and in others, the proceedings before the agency convince the losing party not to pursue the matter in federal court." Woodford v. Ngo, 548 U.S. at 88; see also McCarthy v. Madigan, 503 U.S. at 145 ("When an agency has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided."). "And it can serve judicial efficiency by promoting development of an agency record that is adequate for later court review and by giving an agency a full opportunity to correct errors and thereby narrow or even eliminate disputes needing judicial resolution." Itochu Bldg. Products v. United States, 733 F.3d 1140, 1145 (Fed. Cir. 2013); Kentucky v. United States, 62 Fed. Cl. at 459; Forest Products Nw., Inc. v. United States, 62 Fed. Cl. 109, 122 (2004), aff'd, 453 F.3d 1355 (Fed. Cir. 2006); see also Weinberger v. Salfi, 422 U.S. 749 (1975) (the doctrine of administrative exhaustion may allow an agency "to compile a record which is adequate for judicial review").

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. at 90-91; see also Arctic Slope Native Assoc., Ltd. v. Sebelius, 583 F.3d 785, 793 (Fed. Cir. 2009) ("Statutory time restrictions on the submission of administrative claims are a part of the requirement that a party must satisfy to properly exhaust administrative remedies."), reh'g and reh'g en banc denied (Fed. Cir.), cert. denied, 131 S. Ct. 144 (2010); Kellogg Brown & Root Servs., Inc. v. United States, 115 Fed. Cl. 46, 51 (2014); Paradigm Learning, Inc. v. United States, 93 Fed. Cl. 465, 473 (2010). "The fact that the administrative remedy was provided by a regulation rather than by a statute does not

make the exhaustion doctrine inapplicable or inappropriate." Sandvik Steel Co. v. United States, 164 F.3d at 600; see also Itochu Bldg. Products v. United States, 733 F.3d at 1145 n.1 ("Failure to exploit an available agency remedy, even if not specifically required, can constitute a failure to exhaust in appropriate circumstances." (citing Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("The exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review.")).

The facts of a particular case, however, can call for an exception to otherwise requiring administrative exhaustion. See, e.g., McKart v. United States, 395 U.S. at 197 ("We cannot agree that application of the exhaustion doctrine would be proper in the circumstances of the present case."). "'[A]dministrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further.'" McCarthy v. Madigan, 503 U.S. at 146 (quoting West v. Bergland, 611 F.2d 710, 715 (8th Cir.1979), cert. denied, 449 U.S. 821 (1980)); see also Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 13, reh'g denied, 529 U.S. 1095 (2000) ("Doctrines of 'ripeness' and 'exhaustion' contain exceptions, however, which exceptions permit early review when, for example, the legal question is 'fit' for resolution and delay means hardship, or when exhaustion would prove 'futile[.]'" (citing McCarthy v. Madigan, 503 U.S. at 147–48)) (other citations omitted). The Federal Circuit also has indicated that "[t]he futility exception to the exhaustion requirement has been applied in situations in which enforcing the exhaustion requirement would mean that parties would be required to go through obviously useless motions in order to preserve their rights." Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (internal quotations omitted). The Federal Circuit has explained, however, that "[w]e apply the exception narrowly, however. 'The mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies.'" Palladian Partners, Inc. v. United States, 783 F.3d at 1256 n.3 (quoting Corus Staal BV v. United States, 502 F.3d at 1379).

The SBA has specific procedures regarding a concern's self-certification as small for a particular procurement. See generally 13 C.F.R. §§ 121.1001–121.1010. In order to be considered a small business concern, an offeror must not exceed the size standard for the North American Industry Classification System (NAICS) code specified in a solicitation, which is to be designated by the contracting officer. 13 C.F.R. § 121.402(a)-(b) (2019). A small business concern is required to self-certify that it under the size standard specified in the solicitation.[9]

---

[9] In order to be certified as a small business concern in the System for Award Management database maintained by the federal government, a small business concern is required to annually certify its size in connection with specific size. See 13 C.F.R. § 121.110 (2019). Notably, "[a] contracting officer may accept a concern's self-certification as true for the particular procurement involved in the absence of a written protest by other offerors or other credible information which causes the contracting officer or SBA to question the size of the concern." 13 C.F.R. § 121.405(b) (2019).

A size protest must be filed with the contracting officer for the solicitation, who is required to forward the size protest to the SBA. See 13 C.F.R. § 121.1003 (2019); see also 13 C.F.R. § 121.1005 (2019). In addition, the SBA's regulations for a size protest make plain,

> [a]ppeals from formal size determinations may be made to OHA. Unless an appeal is made to OHA, the size determination made by a SBA Government Contracting Area Office or Disaster Area Office is the final decision of the agency. The procedures for appealing a formal size determination to OHA are set forth in part 134 of this chapter [Chapter 1]. The OHA appeal is an administrative remedy that must be exhausted before judicial review of a formal size determination may be sought in a court.

13 C.F.R. § 121.1101 (2019).[10] See also Taylor Consultants, Inc. v. United States, 90 Fed. Cl. 531, 547 (2009) ("Importantly, 13 C.F.R. § 121.1101 provides explicitly that this administrative remedy 'must be exhausted before judicial review of a formal size determination may be sought in a court.'" (emphasis in original) (quoting 13 C.F.R. § 121.1101(a))); Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. 1, 10 (2007) ("The Area Office's formal size determination may be appealed to the OHA, but if no appeal is taken, the Area Office's size determination is the final decision of the agency." (internal quotation marks and citations omitted)).

In International Management Services, a decision that most closely addresses the issue before this court, a Judge of the United States Court of Federal Claims further explained the procedures for a size protest.

> Protests of a bidder's status as a small business are governed by FAR subpart 19.3 and title 13, parts 121 and 134, of the Code of Federal Regulations. The size protest must be filed with the contracting officer, who then must forward the protest to the appropriate SBA Government Contracting Area Office ("Area Office"). 13 C.F.R. §§ 121.1003, .1006(a); FAR § 19.302(c)(1). The Area Office then has ten business days in which to make a formal size determination. 13 C.F.R. § 121.1009(a); FAR § 19.302(g)(1). Upon making its determination, the Area Office must notify the contracting officer, the protestor, and the protested offeror of its decision via certified mail with return receipt requested. 13 C.F.R. § 121.1009(f); FAR § 19.302(g)(1). The contracting officer can award the contract based on the formal size determination. 13 C.F.R. § 121.1009(g)(2); FAR § 19.302(g)(2).

> The Area Office's formal size determination may be appealed to the OHA, 13 C.F.R. §§ 121.1009(g)(3), .1101(a); FAR § 19.302(i), but if no appeal is

---

[10] Somewhat relatedly, the United States Court of Appeals for the Federal Circuit has concluded that an offeror's "failure to participate in the pending OHA appeal was a failure to exhaust its administrative remedies." Palladian Partners, Inc. v. United States, 783 F.3d at 1261.

taken, the Area Office's size determination "is the final decision of the agency," 13 C.F.R. § 121.1101(a); accord id. § 121.1009(g)(1). The appellant must serve a copy of the appeal petition on the contracting officer. Id. § 134.305(c)(2). If the contracting officer awards the contract prior to receiving notice of the appeal, "the contract shall be presumed valid." FAR § 19.302(g)(2). The OHA's final decision on appeal is the "final decision of the SBA and becomes effective upon issuance." 13 C.F.R. § 134.316(a)-(b). If the OHA dismisses the appeal, "the Area Office size determination remains in effect." Id. § 134.316(b). The SBA is required to inform the contracting officer of the OHA's final decision. FAR § 19.302(i). If the contracting officer receives the OHA's final decision prior to awarding the contract, the decision will apply to the pending procurement. Id.; 13 C.F.R. § 121.1009(g)(3). However, if the contracting officer awards the contract prior to receiving the OHA's final decision, the final decision will apply only to future procurements. 13 C.F.R. § 121.1009(g)(3); FAR § 19.302(i).

Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. at 9-10 (footnotes omitted).

In International Management Services, Inc. v. United States, the Army awarded the contract to the intervenor on September 21, 2007, and six days later, on September 27, 2007, the International Management protestor filed a size protest with the contracting officer. See id. at 10. The International Management court indicated that "[t]he SBA dismissed plaintiff's size protest on October 26, 2007, for lack of standing, and there is no evidence that plaintiff appealed the SBA's dismissal to the OHA." Id. (internal reference omitted). The Judge concluded that:

Congress has delegated to the SBA the authority to promulgate rules and regulations necessary to administer the Small Business Act, Pub. L. No. 85–536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. ch. 14A). 15 U.S.C. § 634(b)(6). Included within this delegation is the authority to establish size standards for small businesses. Id. § 632. Pursuant to this authority, the SBA has promulgated 13 C.F.R. part 121, "Small Business Size Regulations," which includes specific procedures that must be followed to protest SBA size determinations and details the consequences of not complying with those procedures. The court cannot, and will not, ignore these regulations. Here, the contracting officer was authorized to award a contract based on a formal size determination, and did so without any notice that an appeal was pending before the OHA. Consequently, there can be no postaward size determination of defendant-intervenor or Torres that would apply to this contract.

Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. at 10-11.

There is no evidence in the record before the court that Harmonia made a size protest with the contracting officer, or any action was taken before the SBA. Harmonia also does not allege that it made a size protest during the solicitation process.

Furthermore, protestor agrees that a size determination is "solely within the purview of the SBA." Therefore, if Harmonia is making a size protest before this court in the first instance, the size protest must fail.

Harmonia argues that this protest "is not a size protest," but instead argues "[w]hat Harmonia asks the Court to determine is if the Agency's failure to recognize the ostensible subcontracting issue and refer Alethix to the SBA for a size determination was irrational." Protestor argues that the cover page of Alethix's proposal stated that intervenor submitted it "[i]n partnership with: [redacted]," and "[t]his should have been the Agency's first clue that it might have an ostensible subcontractor problem on its hands." Protestor further claims that "[e]xamination of Alethix's proposal leaves no doubt that [redacted], not Alethix, proposed to perform the Enterprise Reporting Effort," and "[b]y ignoring the substantial red flags in Alethix's proposal, the Agency acted irrationally."

Despite protestor's protestations to the contrary, claiming that "Harmonia does not ask the Court to overturn an SBA size determination: It asks the Court to direct the Agency to refer Alethix to SBA to make a size determination," it is apparent that protestor seeks to have a size determination at this late stage of the proceedings. As SBA regulations specifically provide, a size protest must be filed with the contracting officer for the solicitation, who is required to forward the size protest to the SBA. See 13 C.F.R. § 121.1003. Moreover, before a protest regarding size can be brought in court:

> Appeals from formal size determinations may be made to OHA. Unless an appeal is made to OHA, the size determination made by a SBA Government Contracting Area Office or Disaster Area Office is the final decision of the agency. The procedures for appealing a formal size determination to OHA are set forth in part 134 of this chapter. The OHA appeal is an administrative remedy that must be exhausted before judicial review of a formal size determination may be sought in a court.

13 C.F.R. § 121.1101; see also Taylor Consultants, Inc. v. United States, 90 Fed. Cl. at 547 ("Importantly, 13 C.F.R. § 121.1101 provides explicitly that this administrative remedy 'must be exhausted before judicial review of a formal size determination may be sought in a court.'" (emphasis in original) (quoting 13 C.F.R. § 121.1101(a))). As noted above, in the current protest before the court, none of the those steps have taken place. The SBA regulations generally provide that a protest is considered timely when filed with the contracting officer by the close of the fifth business day after bid opening or the close of the fifth business day after notice to offerors of the selection of the successful offeror. See 13 C.F.R. § 121.1004(a) (2019).[11] Protestor seeks a work around the timing requirement

---

[11] 13 C.F.R. § 121.1004(a) provides:

Protests by entities other than contracting officers or SBA-

(1) Sealed bids or sales (including protests on partial set-asides and reserves of Multiple Award Contracts and set-asides of orders against Multiple Award Contracts). A protest must be received by the contracting

officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after bid opening for

 (i) The contract; or

 (ii) An order issued against a Multiple Award Contract if the contracting officer requested a new size certification in connection with that order.

(2) Negotiated procurement (including protests on partial set-asides and reserves of Multiple Award Contracts and set-asides of orders against Multiple Award Contracts). A protest must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after the contracting officer has notified the protestor of the identity of the prospective awardee for

 (i) The contract; or

 (ii) An order issued against a Multiple Award Contract if the contracting officer requested a new size certification in connection with that order.

(3) Long–Term Contracts. For contracts with durations greater than five years (including options), including all existing long-term contracts, Multi-agency contracts, Governmentwide Acquisition Contracts and Multiple Award Contracts:

 (i) Protests regarding size certifications made for contracts must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after receipt of notice (including notice received in writing, orally, or via electronic posting) of the identity of the prospective awardee or award.

 (ii) Protests regarding size certifications made for an option period must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after receipt of notice (including notice received in writing, orally, or via electronic posting) of the size certification made by the protested concern.

  (A) A contracting officer is not required to terminate a contract where a concern is found to be other than small pursuant to a size protest concerning a size certification made for an option period.

by having this court direct the SBA to conduct a size protest. In addition to being out of time, the protestor, attempting to the court to compel a late size protest is in strict contrast to the text of the SBA regulations which state that "[t]he OHA appeal is an administrative remedy that must be exhausted before judicial review of a formal size determination may be sought in a court." 13 C.F.R. § 121.1101.

Oddly, protestor cites to International Management Services, Inc., for support, stating "[i]n the sole case Harmonia has found in which the Court of Federal Claims addressed this type of protest, it assumed, without deciding, that it had jurisdiction before finding the protestor did not have standing." As quoted above, however, the Judge in International Management determined:

> Congress has delegated to the SBA the authority to promulgate rules and regulations necessary to administer the Small Business Act, Pub. L. No. 85–536, 72 Stat. 384 (1958) (codified as amended at 15 U.S.C. ch. 14A). 15 U.S.C. § 634(b)(6). Included within this delegation is the authority to establish size standards for small businesses. Id. § 632. Pursuant to this authority, the SBA has promulgated 13 C.F.R. part 121, "Small Business Size Regulations," which includes specific procedures that must be followed to protest SBA size determinations and details the consequences of not

---

> (B) [Reserved]
>
>> (iii) Protests relating to size certifications made in response to a contracting officer's request for size certifications in connection with an individual order must be received by the contracting officer prior to the close of business on the 5th day, exclusive of Saturdays, Sundays, and legal holidays, after receipt of notice (including notice received in writing, orally, or via electronic posting) of the identity of the prospective awardee or award.
>
> (4) Electronic notification of award. Where notification of award is made electronically, such as posting on the Internet under Simplified Acquisition Procedures, a protest must be received by the contracting officer before close of business on the fifth day, exclusive of Saturdays, Sundays, and legal holidays, after the electronic posting.
>
> (5) No notice of award. Where there is no requirement for written pre-award notice or notice of award, or where the contracting officer has failed to provide written notification of award, the 5–day protest period will commence upon oral notification by the contracting officer or authorized representative or another means (such as public announcements or other oral communications) of the identity of the apparent successful offeror.

13 C.F.R. § 121.1004(a).

> complying with those procedures. The court cannot, and will not, ignore
> these regulations. Here, the contracting officer was authorized to award a
> contract based on a formal size determination, and did so without any notice
> that an appeal was pending before the OHA. Consequently, there can be
> no postaward size determination of defendant-intervenor or Torres that
> would apply to this contract.

Int'l Mgmt. Servs., Inc. v. United States, 80 Fed. Cl. at 10-11. The court sees no support for protestor's position regarding the International Management case.

The court determines that despite the language used by Harmonia in its submissions to this court, the effect of Count 2, "[t]he Agency's failure to recognize the ostensible subcontractor issue apparent on the face of Alethix's proposal and refer Alethix to the SBA for a Status Determination was irrational and contrary to regulation," seeks to compel this court to make a size determination by referring the matter to the SBA. As protestor did not raise this issue with the Agency, nor did the SBA make a size determination before or after award was made, the court declines to make a post-award size determination, or refer the issue to the SBA. The defendant's and intervenor's motion to dismiss Count 2 is granted.

The court next considers the parties' cross-motions for judgment on the Administrative Record for Count 1 and Count 3. Rule 52.1(c)(1) (2019) of the Rules of the United States Court of Federal Claims (RCFC) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed

under APA standards, making applicable the standards outlined in <u>Scanwell Labs., Inc.</u> <u>v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. <u>See</u>, <u>e.g.</u>, <u>Per Aarsleff A/S v. United States</u>, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), <u>see</u> 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting <u>NVT Techs.,</u> <u>Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing <u>PAI Corp. v. United</u> <u>States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); <u>Impresa Construzioni Geom. Domenico</u> <u>Garufi v. United States</u>, 238 F.3d at 1332; <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc.</u> <u>v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir.) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), <u>reh'g denied</u> (Fed. Cir. 2004); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting <u>Impresa Construzioni Geom.</u> <u>Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>Info. Tech. & Applications Corp. v.</u> <u>United States</u>, 316 F.3d at 1319.

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United</u> <u>States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). <u>See</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350-51 (citing <u>Advanced</u> <u>Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057-58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[12] <u>see also</u> <u>Veterans</u>

---

[12] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

Contracting Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp.

---

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
       (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
       (B) contrary to constitutional right, power, privilege, or immunity;
       (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
       (D) without observance of procedure required by law;
       (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
       (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531-32 ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 U.S. 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles &

Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); ); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the United States Court of Appeals for the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where, as here, a bid protester challenges the procurement official's decision as lacking a rational basis, we must determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. at 496. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'" (citation omitted)).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

With regard to Count 1, in addition to the above cited deference owed to the Agency in a bid protest, "[t]he court gives great deference to an agency's technical evaluation of an offeror's proposal." North South Consulting Grp. v. United States, 141 Fed. Cl. 549, 554 (2019) (quoting Textron, Inc. v. United States, 74 Fed. Cl. 277, 297 (2006); see also L-3 Commc'ns. EOTech, Inc. v. United States, 87 Fed. Cl. 656, 664 (2009). "[T]echnical ratings and the timing of various steps in the procurement involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d at 449 (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958); see also Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals."). "This deference is heightened for cases involving highly technical subject matter." Red Cedar Harmonia, LLC v. United States, 144 Fed. Cl. 11, 22 (2019).

Protestor argues "[t]he Agency's assignment of two risks to Harmonia for proposal strengths was irrational." First, protestor claims "[t]he Agency's assignment of a risk for cross-training its development staff and peer-testing other developer's code was irrational," because "[n]either practice as Harmonia proposed them leads to any risk of

non-performance, and both **enhance** the chance of successful performance." (emphasis in original). Second, protestor argues that "[i]t was irrational to assign Harmonia a risk for proposing the use of [redacted]." Defendant responds that "Harmonia's challenge to the assignment of two risks to its technical proposal" should be rejected because "it amounts to mere disagreement with the technical evaluation." Intervenor, similarly, argues that "[t]he Agency's assignment of risk for Harmonia's proposed cross-training and peer testing was reasonable."

As noted above, the Technical Evaluation Team stated, in part, with regard to protestor's risks for Factor 1 - Technical:

**Risks:**

3. **Technical approach – RFP C.3.1/Proposal Page 2-6, Section 2.2.1.** The offeror proposes cross-training of development staff and peer testing of other developer's code. Cross-training of staff or peer testing could cause delays in delivery of software. This is considered a low risk since ADSD [Applications Development and Services Division] monitors contractor performance and tasking to maintain cost controls.

4. **Technical approach – RFP C.3.1/Proposal Page 2-8, Section 2.2.1.** The offeror proposes the introduction of [redacted]. However, as of now, it is unclear if [redacted] is compatible with existing USCB [United States Census Bureau] systems, it could create significant integration issues leading to an increase of costs, lost development time, and schedule delays. This is considered a moderate risk since this could introduce a level of complexity to our environment making issues harder to troubleshoot and software tools harder to integrate.

(emphasis in original).

For the cross-training and peer testing risk, protestor notes that in addition to the finding a risk, in its technical evaluation, the Technical Evaluation Team also found a strength, which stated: "The offeror proposes cross-training of development staff. This is significant because this would eliminate single points of failure/dependencies on individuals and make the overall team (Government and Contractor) more efficient in responding to inquiries and issues." Protestor argues that "[a]ssigning this aspect of Harmonia's proposal a risk, while simultaneously finding it to be a strength in the same evaluation factor defies logic, and is the epitome of arbitrary, capricious, and irrational behavior." Protestor also claims that "it appears that the Agency misread or misunderstood Harmonia's proposal. Harmonia did not propose that it would peer test **anyone else's** code. What Harmonia proposed was that it would develop its **own** code, then peer test it." (emphasis in original). Protestor, however, overlooks that the evaluation risk noted by the Agency was "[c]ross-training of staff or peer testing could cause delays in delivery of software." The Agency did not indicate that peer testing another's code would cause delays, but that any peer testing might cause delay. In addition, it appears

reasonable to the court that the same proposal could have benefits, but also pose some risk, as the Agency appeared to see the benefit if cross training "would eliminate single points of failure/dependencies on individuals and make the overall team (Government and Contractor) more efficient in responding to inquiries and issues," but also the risk if it "could cause delays in delivery of software." Moreover, the Agency only considered the risk of cross training "a low risk" because, as the Technical Evaluation Team explained, the Applications Development and Services Division "monitors contractor performance and tasking to maintain cost controls." Furthermore, the Agency's approach to cross-training was consistent among the proposals, as the awardee was awarded a strength, and a weakness for proposing cross-training. For Alethix's proposal the Technical Evaluation Team indicated as a strength for Factor 1:

> **Management Approach – RFP C.3.6.2.3/Proposal Page 22, Section 4.6.** The offeror proposes staff cross-training. This is significant because this would enhance the program's ability to withstand departures or extended leave, and greatly enhance the program's ability to provide support during times of staffing transitions.

(emphasis in original). The Technical Evaluation Team also noted a weakness for Alethix's proposal for Factor 1:

> **Management Approach – RFP C.3.6.2.3/Proposal Page 22, Section 4.6.** The offeror proposes cross-training of development staff and peer testing of other developer's code. Cross-training of staff or peer testing could cause delays in delivery of software. This is considered a low risk since ADSD monitors contractor performance and tasking to maintain cost controls.

(emphasis in original). Furthermore, as noted above, technical ratings and the timing of various steps in the procurement involve discretionary determinations of procurement officials that a court will not second guess." E.W. Bliss Co. v. United States, 77 F.3d at 449 (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958).

Protestor also cites to Allied Technology Group, Inc. v. United States, 94 Fed. Cl. 16 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011), to show inconsistency "in a technical evaluation where evaluators 'marked both "significant strength" and "significant weakness" for the same proposal feature in the same sub-factor.'" The court notes, however, in Allied, members of the Technical Evaluation Panel marked both "significant strength" and "significant weakness" for the same proposal feature in the same sub-factor, but for different offerors. See id. at 46. The Allied court, by way of example, stated "[o]ne evaluator identified Avue's Concierge Service as a 'significant strength,' but then assigned Allied a 'significant weakness' for the same feature. Also, it appears that evaluators credited Monster with 'significant strengths' for ARS system [Automated Integrated Staffing, Recruitment and Position Classification System] features for which Allied was not similarly credited." Id. (internal references omitted). The inconsistency was by way of comparison between different offerors, not the same offeror's proposal. Moreover, in Allied, the court concluded that "[t]o be sure, DOJ did not conduct a flawless

procurement, but its award decision has a reasonable basis. The Court cannot say that DOJ's ultimate selection of Monster was arbitrary or capricious, even if the Court itself might have conducted the procurement more in accord with the agency's acquisition plan." Id. at 24. Disagreement with the Agency's evaluation, however, is not a sufficient ground to find for protestor. See Bannum, Inc. v. United States, 91 Fed. Cl. 160, 176 (2009) ("Bannum continues to assert mere disagreement with the BOP's [Federal Bureau of Prisons'] assessment of its proposal. These contentions remain insufficient to persuade the Court that the BOP acted unreasonably. See JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 660 (2002) (determining that 'naked claims' of disagreement with evaluations 'no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.'"); see also Def. Base Servs., Inc. v. United States, 19-1608C, 2020 WL 1228437 at *9 (Fed. Cl. Mar. 13, 2020) ("An offeror's disagreement with the agency's judgment, without more, is insufficient to establish that the agency acted unreasonably."); Harmonia Holdings Grp., LLC v. United States, 146 Fed. Cl. 799, 816 (2020) ("Additionally, the Court concludes plaintiff's argument that the Agency irrationally determined Harmonia did not fully understand the contract's requirements amounts to a mere disagreement with the Agency's decision, and therefore falls short of meeting the burden of proof required to establish that the Agency's action was arbitrary and capricious.").[13] If the Agency in the above captioned protest believed that despite the potential benefits of peer-testing and cross-training, there was a risk of delays, the court does not find it an arbitrary consideration by the Agency as part of its evaluation decision-making process.

Regarding the second risk, involving [redacted], the Agency determined "as of now, it is unclear if [redacted] is compatible with existing USCB [United States Census Bureau] systems, it could create significant integration issues leading to an increase of costs, lost development time, and schedule delays. This is considered a moderate risk since this could introduce a level of complexity to our environment making issues harder to troubleshoot and software tools harder to integrate." Protestor argues that "Harmonia did not propose that it **would** necessarily use [redacted]," but that Harmonia's technical proposal indicated that it would use "an [redacted][14] [redacted], **such as** [redacted]." (emphasis in original). The court first notes that it was not in passing that protestor mentioned [redacted]. The full context of protestor's reference "such as [redacted]" from its proposal is:

> We propose the use of an [redacted], such as [redacted] (which we are implementing for USDA [§5.2]), to potentially reduce development time and accelerate information capability delivery. [redacted] is a comprehensive data warehousing development suite that seamlessly integrates the full

---

[13] The court notes that the cited Harmonia Holdings decision is an unrelated protest brought by protestor regarding a pre-award protest for a solicitation issued by the United States Customs and Border Protection. See generally Harmonia Holdings Grp., LLC v. United States, 146 Fed. Cl. 799.

[14] As indicated above, "[redacted]" stands for [redacted].

development life-cycle through integrated metadata & automation. [redacted] interfaces with SAS among other systems. Benefits with an [redacted] include introduce data sources faster, lower project cost, flatten development team, and automate documentation. (In Figure 3 [included in Harmonia's proposal] the red arrows signify data movement utilizing [redacted] or web services which would be [redacted], for e.g. using [redacted]). The [redacted] will also shorten development cycle time by ~65% by linking data models through the tool. Any changes to the data models at the source or target automatically rewrite the [redacted] process to move data between source and target.

(third brackets in original). If there was the possibility that the Agency could erroneously think protestor was relying on [redacted], it was the obligation of the offeror to make it that clear that Harmonia would not be relying on [redacted] in its proposal. See Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 744 (2009) (citing CACI Techs., Inc., B296946, 2005 CPD ¶ 198 at 5, 2005 WL 3143443 at *3 (Comp. Gen. Oct. 27, 2005) ("[A]n offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency."). As noted by the Structural Associates court, "[p]laintiff's failure to provide more detailed information is chargeable to it alone." Id.[15] It was not unreasonable for the Agency to be concerned if [redacted] was compatible with existing Census Bureau systems, which "could create significant integration issues leading to an increase of costs, lost development time, and schedule delays." To demand that the Agency evaluate protestor's technical proposal as if it did not plan on using [redacted] is to second guess the Agency's technical evaluation process, which the court should not do so. See E.W. Bliss Co. v. United States, 77 F.3d at 449 (citing Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958). Therefore, protestor has not demonstrated that the either of the Agency's technical evaluations and assignment of the two risks to Harmonia's technical proposal were arbitrary or capricious.

Regarding Count 3, protestor alleges "[t]he Solicitation stated that the Agency would not choose a higher-priced offeror's proposal unless it presented material technical advantages over other proposals. What it did was worse." Protestor claims that "[i]f Factor 1 was the determining factor, then Harmonia should have won award, particularly as it proposed a lower price than Alethix. The Agency acted irrationally when it made award to a lower-rated, more-expensive offeror contrary to the Solicitation's terms." As repeatedly noted above, "[c]ontracting officers 'are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process,'" PAI Corp. v. United

---

[15] As noted above, protestor was also awarded a strength for relying on [redacted] in its technical proposal, with the Technical Evaluation Team determining: "The offeror proposes the introduction of [redacted]. This is significant because this would create efficiencies in the development cycle that will save time and, potentially, money allowing developers to be more efficient." The court further notes that protestor does not object to be awarded a strength for the use of [redacted].

States, 614 F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332), and "[a]ccordingly, procurement decisions are subject to a 'highly deferential rational basis review.'" Id. (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

The United States Court of Appeals for the Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best-value determinations, as compared to deciding on price alone. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. at 199; Citizant, Inc. v. United States, 142 Fed. Cl. 260, 268-69 (2019); North South Consulting Grp., LLC v. United States, 141 Fed. Cl. at 554 ("The protestor's burden is especially heavy in negotiated, best value procurements."); Optimization Consulting, Inc. v. United States, 115 Fed. Cl. 78, 89 (2013); Amazon Web Servs., Inc. v. United States, 113 Fed. Cl. 102, 110 (2013) ("Contracting officers are afforded 'an even greater degree of discretion when the award is determined based on the best value to the agency.'" (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)); Akal Sec., Inc. v. United States, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted in D & S Consultants, Inc. v. United States:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. DynCorp Int'l v. United States, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. Id. Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best-value determinations than in procurements based on

cost alone); <u>PHT Supply Corp. v. United States</u>, 71 Fed. Cl. 1, 11 (2006) ("It is critical to note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." <u>Banknote Corp. of Am. Inc. v. United States</u>, 365 F.3d at 1355 (citing <u>TRW, Inc. v. Unisys Corp.</u>, 98 F.3d at 1327-28; <u>E.W. Bliss Co. v. United States</u>, 77 F.3d at 449; <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 958–59); <u>see also</u> <u>Am. Tel. & Tel. Co. v. United States</u>, 307 F.3d at 1379; <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d at 958; <u>Brooks Range Contract Servs., Inc. v. United States</u>, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (internal citations omitted)); <u>Matt Martin Real Estate Mgmt. LLC v. United States</u>, 96 Fed. Cl. 106, 113 (2010); <u>Serco v. United States</u>, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

Protestor concedes that "[c]ourts afford the government 'considerable deference' in a best-value determination," (quoting <u>Serco Inc. v. United States</u>, 81 Fed. Cl. 463, 496 (2008)), but argues that "[t]he Agency's evaluation errors infected the source selection decision, rendering it irrational and contrary to the Solicitation's terms." Protestor argues that regarding its pending motion, "[f]irst, as shown in Section I, the contracting officer should have recognized the apparent ostensible subcontractor issues in Alethix's proposal," and "[a]s discussed in Section II, the Technical Evaluation Team assigned two irrational and unwarranted risks to Harmonia's proposal in Factor 1." Defendant argues that "Harmonia's challenge to the best-value determination largely rests on its meritless small business and technical evaluation arguments." Intervenor contends that "Harmonia's protest of the Agency's best value determination hinges upon its challenges to Alethix's small business size status and the Agency's technical evaluation of Harmonia's proposal. Because those underlying protest challenges fail, Harmonia's challenge to the best value determination should also be denied." The court agrees with intervenor, having found the technical evaluation for Count 1 was not arbitrary or capricious, and having determined that Count 2 was an impermissible size protest, the court does not believe errors "infected" the best value determination or the source selection decision.

Relatedly, protestor argues that "[u]nder the terms of the Solicitation, 'the Government will not make an award at a higher overall price to the Government to achieve slightly superior technical skills.' Given the source selection authority's decision to use Factor 1 as the discriminator, what the Agency did is make award to a **weaker** technical proposal at a **higher** price." (emphasis in original; internal reference omitted). Despite protestor's claims, the court notes that the Best Value Recommendation and Trade-Off Analysis determined:

Alethix provided a thorough technical proposal that demonstrated significant strengths presenting numerous benefits to the Government. Alethix's technical proposal had no notable or significant weaknesses or risks. Alethix's technical approach demonstrated their capability to successfully perform the requirements and introduces innovative approaches, methods, and procedures that would benefit programs across the USCB [United States Census Bureau] for years to come.

The Best Value Recommendation and Trade-Off Analysis noted that "[o]verall, Alethix proposed utilizing cutting edge, next generation technologies, developing [redacted] and deploying a [redacted] that could not only create efficiencies in our team performance, but improve quality and reduce costs for operations across the enterprise." The Best Value Recommendation and Trade-Off Analysis also determined "[t]he Technical proposal presented by Alethix warrants the higher overall task order price as outlined above." Finally, the Best Value Recommendation and Trade-Off Analysis concluded:

> Alethix's technical proposal, based on the narrative in the TET consensus report, as well as Section 6 - Trade-Off Analysis and Section 7 - Best Value Recommendation, was technically superior to the proposals submitted by other Offerors and had the highest price of $38,216,255.80 for the base and option periods. Comparing the relative strengths, weaknesses, and risks as documented in the TET consensus report, Alethix's proposal possessed the highest quality strengths in the technical proposal, without any notable or significant weaknesses and risks. In conclusion, Alethix's proposal provides the Best Value to the Government. With price and other factors considered, it is the PET and TET's recommendation that Alethix's proposal is the best value for the Government in comparison to all the other Offerors. Alethix is recommended for award at a total estimated price of $38,216,255.80 for the base and option periods. Alethix proposed a technically superior approach to meeting task order requirements that will provide innovation and price benefit to the Government.

Likewise, the Award Decision Memorandum concluded, in the section titled "Award Determination:"

> Alethix's technical proposal, based on the narrative in the TET consensus report, as well as Section 6-Trade-Off Analysis , and Section 7 - Best Value Recommendation of the Best Value Recommendation document, was technically superior to the proposals submitted by other Offerors. Comparing the relative strengths, weaknesses, and risks as documented in the TET consensus report, Alethix's proposal possessed the highest quality strengths in the technical proposal, without any notable or significant weaknesses and risks. In conclusion, Alethix's proposal provides the Best Value to the Government. With price and other factors considered. it is the Contracting Officer's determination, Dijon Ferdinand, [sic] that Alethix's

proposal is the best value for the Government in comparison to all the other Offerors. The Contracting Officer, Dijon Ferdinand, has determined award to Alethix, LLC at a total estimated price of $38,216,255.80 for the base and option periods is in the best interest to the Government. Alethix proposed a technically superior approach to meeting task order requirements that will provide innovation and price benefit to the Government.

The court does not find that the decision to award the task order to Alethix was arbitrary or capricious. Nor does the court find that the protestor has met its heavy burden to convince the court otherwise. See E.W. Bliss Co. v. United States, 77 F.3d at 449; Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. at 199; Optimization Consulting, Inc. v. United States, 115 Fed. Cl. at 89.

### CONCLUSION

As determined above, the defendant's and intervenor's motion to dismiss Count 2 is **GRANTED**. As also determined above, defendant's and intervenor's motion for judgment on the Administrative Record for Count 1 and Count 3 are **GRANTED**. Protestor's motion for judgment on the Administrative Record is **DENIED**. Protestor's protest is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**